**IN THE COURT OF APPEALS FOR THE STATE OF WASHINGTON**

| | |
|---|---|
| STATE OF WASHINGTON, | No. 77224-4-I |
| Respondent, | |
| v. | DIVISION ONE |
| RYAN EMBRY CHANDLER, | UNPUBLISHED OPINION |
| Appellant. | FILED: March 4, 2019 |

LEACH, J. — Ryan Chandler challenges the sufficiency of the evidence to support his conviction for felony harassment. Because sufficient evidence supports the jury's verdict, we affirm.

## BACKGROUND

William Chandler is the father and primary caregiver of Ryan.[1] Ryan has a history of mental illness. At the time of the charged incident in 2016, Ryan lived in a trailer on his father's property in Redmond, Washington. This property includes a house and a barn-like building across the property from the trailer used by William as an office and garage.

---

[1] Because the appellant and his father share the same last name, they are referred to here by their first names.

Before 2016, Ryan had acted violently toward William a number of times. William testified that he could recognize a hostile episode because Ryan's "eyes change[d], he [didn't] talk rationally . . . and [he got] mad at [William] for things" like refusing to loan him a car. During the episodes, Ryan usually acted aggressively and sometimes violently.

Ryan is "slim" and "muscular" and "bigger and stronger and [could] run faster than" William. William's strategy during hostile episodes was to "leave and let it defuse in itself or defuse it by talking." William never saw Ryan be violent with others.

William keeps a Mercedes in the barn garage on the first floor. A door at the rear of the garage leads to an office where William conducts his business. On the second floor, there is an additional office with his main computers. This room also has a bed and microwave so William can stay there, particularly when he needs to be around to support Ryan. The door upstairs has a beam on the interior that can be dropped into hooks to barricade it. William installed this door after a violent episode with Ryan.

On October 26, 2016, Ryan texted William that he wanted a gun, a bicycle, and $1,000 or, he said, "[T]hings were going to happen." William texted back to gauge Ryan's level of anger and determine whether he could calm him down. William testified that Ryan seemed "very angry" and did not appear to be calming down. William headed home on "high alert." On the way, he met with a

sheriff's officer at an Albertson's store, reported his concerns, and told the officer that he had had this sort of experience before.

When William arrived home, he discovered that the door to his office upstairs in the barn "had been bashed in [and] split." Someone had rifled through a storage area where he previously kept guns. His computer and hard drives were removed. A key to his Mercedes, which only Ryan knew about, and the Mercedes were gone. William texted and called Ryan. But Ryan did not respond. William went by Ryan's trailer. There, he saw the Mercedes parked. He thought that perhaps a "night['s] sleep[ ]" would solve the problem and decided to wait until noon the next day to talk to him. William reported the incident to the police and met with them at a church nearby.

Around noon on October 27, 2016, William walked from the barn to the Mercedes, which was still parked next to the trailer. Ryan came out and started threatening William. His threats included profanity and statements like, "You're going to die now; You've been messing with me too long; You're going to die now and I'm going to do it." Ryan repeated the threat "numerous times in a number of different ways," including saying, "I'm going to kill you." William described them as the "most hostile threats [he'd] ever had from [Ryan].

Standing about 10 feet from Ryan, William consciously kept the car between them. He continued to talk to Ryan, trying to calm the situation. He got to the point where he was closest to the barn and Ryan was blocked by the Mercedes and he ran "quite a ways away and [Ryan] ran" after him. He looked

back, and Ryan had stopped. He tried to calm Ryan by talking to him. He then ran to the barn and up the stairs. He was able to close the damaged door and secure it by dropping the beam into the hooks. When Ryan arrived at the now-secured door, he started pounding on it, continuing to utter threats.

William called 911. He told the operator that his mentally ill son was threatening him. He said he was "locked upstairs in [his] office, and he's banging on the doors and screaming he's going to kill me." William explained he was in the barn in his office and was "barricaded in." He told the operator that Ryan "won't be able to" break in. He said that he was "prepared for this," that he had "beams across the door," and that he was "safe for the moment." He also told the operator that he needed to "get the hell out" of there. He said that Ryan did not have guns but that he had a hunting knife and a machete where he stays. He did not think Ryan had them with him. But he wasn't sure.

Ryan stopped banging. When William felt safe, he looked out the window and saw Ryan walk away and then return without anything in his hands. Ryan entered the barn and started breaking things downstairs. He climbed the stairs and started banging hard enough on the door for the 911 operator on the phone to hear. William thought he "had something, a beam or something" or "a pry bar and [was] trying to pry [the door open]." He told the operator, "My god. I hope they get here soon, I'm jumping out the back door." He clarified that he would jump only if Ryan got the door open. Near the end of the call, he said, "I don't

know what he's got. He's screaming he's going to—Oh, gosh, somebody else is here. God help me."

Then the banging stopped again, and William saw Ryan walk back down to his trailer. The 911 operator told William that the police were arriving and they might be who he was hearing. William saw Ryan walk "a couple hundred feet away" into the woods. When William felt safe, he opened the door and saw the sheriff's officers. They initially pointed their assault rifles at him, but he told them he was the father and that they were not in danger. He told them Ryan did not have guns and described that morning's incident. He said he was afraid Ryan would carry out his threat to kill him and told them about Ryan's history of hostile behavior. The officers searched for Ryan and detained him.

About 10-15 minutes elapsed between the moment Ryan was at the trailer yelling to the point he walked away from the barn and William opened the door. According to William, during this time he "was afraid for [his] life." He said that if anyone else had done what Ryan did to him, he would "hit him with a pipe or shoot him or whatever [he] could do." But he could not do that to Ryan because he was his son, and he would not "hurt [his] son."

A jury found Ryan guilty of felony harassment.[2] He appeals.

---

[2] RCW 9A.46.020(1), (2)(b). The jury also issued a special verdict of domestic violence. RCW 10.99.020.

## STANDARD OF REVIEW

A challenge to the sufficiency of the evidence presents a question of constitutional law that an appellate court reviews de novo.[3] The State must prove all the elements of an offense beyond a reasonable doubt.[4] To evaluate whether sufficient evidence supports a conviction, this court views the evidence in the light "most favorable to the State" and asks whether "<u>any rational trier of fact</u> could have found the essential elements [of the crime charged] <u>beyond a reasonable doubt</u>."[5] This court gives circumstantial and direct evidence equal weight in this analysis.[6] To affirm a conviction, an appellate court does not decide whether the accused was guilty beyond a reasonable doubt but whether substantial evidence supports the conviction.[7] It defers to the jury's evaluation of witness credibility, resolution of testimony in conflict, and weight and persuasiveness of the evidence.[8]

## ANALYSIS

Ryan challenges the sufficiency of the evidence to support his conviction. He asserts that William's "claim of fear was unreasonable" because Ryan could not have killed William under the circumstances. He asks this court to reverse the conviction and dismiss the charge.

---

[3] <u>State v. Rich</u>, 184 Wn.2d 897, 903, 365 P.3d 746 (2016).
[4] U.S. CONST. amend. XIV; WASH. CONST. art. I, § 3; <u>In re Winship</u>, 397 U.S. 358, 363-64, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970).
[5] <u>State v. Green</u>, 94 Wn.2d 216, 221-22, 616 P.2d 628 (1980).
[6] <u>State v. Thomas</u>, 150 Wn.2d 821, 874, 83 P.3d 970 (2004).
[7] <u>State v. Fiser</u>, 99 Wn. App. 714, 718, 995 P.2d 107 (2000).
[8] <u>Thomas</u>, 150 Wn.2d at 874-75.

To convict Ryan of felony harassment based on his threat to kill William, the State had to prove, beyond a reasonable doubt, that Ryan, without lawful authority, knowingly threatened to kill William immediately or in the future, and that Ryan's words or conduct placed William in reasonable fear that Ryan's threat to kill would be carried out.[9]

The trial court correctly instructed the jury to apply an objective standard to decide whether William's fear that Ryan would carry out his threat was reasonable.[10] A statement or act is a threat only if it occurs under circumstances where a reasonable person, in the position of the speaker, should expect that the statement or act would be interpreted as a serious expression of intent to carry out the threat rather than as something said in jest or idle talk.[11]

Ryan concedes that "there was ample proof that [he] threatened to kill his father." But he asserts that the context of his threatening statements does not support the State's claim that William had a reasonable fear that Ryan would kill him immediately or in the near future. Ryan first focuses on the Mercedes separating him from his father and then the door that stood between them. In particular, he notes that William had fortified the door with bars to withstand assault. He asserts that William's testimony shows he "was confident the door would withstand any assault from the outside." He notes William's call to 911

---

[9] RCW 9A.46.020(1)(a)(i), (2)(b).
[10] State v. Ragin, 94 Wn. App. 407, 411, 972 P.2d 519 (1999).
[11] Ragin, 94 Wn. App. at 411.

during which William said that Ryan was "outside banging on the doors with something big and trying to break in, but he won't be able to."

But Ryan's argument ignores other parts of William's testimony and the contents of the 911 call. The evidence as a whole is sufficient for a rational juror to conclude that a reasonable person in William's circumstance would fear that Ryan was going to kill him immediately or in the near future.

Initially, William told the dispatcher that he was momentarily safe. He also indicated that Ryan damaged the door the previous day. As the call continues, it becomes clearer that William fears Ryan will breach the door. William thought Ryan "had . . . a beam or something." At that point, the banging was so loud the operator could hear it over the phone. William told the operator that he was ready to jump out the second story window or double doors if Ryan got through the door. He said, "My god. I hope they get here soon, I'm jumping out the back door." Just before the officers arrived, William said, "He's screaming he's going to—Oh, gosh, somebody else is here. God help me." Ryan was larger and stronger and suffering an "episode." He was yelling that he was going to kill William and similar threats. William did not and could not know if the door would withstand Ryan's attack until help arrived. A reasonable juror could conclude that William reasonably feared for his life under these circumstances.

William's testimony about the Mercedes and his history with Ryan bolsters the jury's verdict. William's race to his barricaded room from the alleged safety of the Mercedes shows that William did not believe that the car provided enough

protection from Ryan and that William feared for his life. Further, William testified about a 2013 incident where Ryan punched William with "the hardest hit [he'd] ever had in [his] life" and then came after him with a knife. After William escaped to his car, Ryan stabbed at the car several times.

Ryan likens this case to State v. C.G.,[12] where a high school student, while removed from a classroom by the vice-principal and another teacher, threatened to kill the vice-principal. The Washington Supreme Court reversed C.G.'s conviction for felony harassment.[13]

But the circumstances in C.G. differ from those here. There, two adults together escorted the teenager out of the classroom. The vice-principal testified that he thought she might harm, not kill, him or someone else in the near future.[14] Here, William, alone, faced a "larger and stronger" Ryan, who had injured him before. A splintered door separated him from his son, who banged on it while threatening to kill him. The contrast in circumstances between this case and C.G. highlights the reasonableness of William's fear.

The evidence, viewed as a whole with all reasonable inferences drawn in the State's favor, more than sufficiently supports a rational juror's conclusion that William reasonably feared Ryan was going to kill him.

---

[12] 150 Wn.2d 604, 606-07, 80 P.3d 594 (2003).
[13] C.G., 150 Wn.2d at 612.
[14] C.G., 150 Wn.2d at 611.

## CONCLUSION

We affirm. The trial record includes sufficient evidence to support Ryan's conviction for felony harassment. A rational juror could conclude beyond a reasonable doubt that a reasonable person in William's situation would believe Ryan was going to kill him.

_Leach, J._

WE CONCUR:

_Chun, J._ _Andrus, J._